**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

**ROGERS KENTUCKY, LLC** **PLAINTIFF**

**v.** **No. 4:23-cv-50-BJB**

**JAMES M. THORNBERRY, ET AL.** **DEFENDANTS**

* * * * *

**OPINION & ORDER REMANDING APPRAISAL AWARD**

This dispute concerns the lease-renewal terms for the Northridge Shopping Center in Madisonville, Kentucky. The parties disagree about whether a group of three appraisers properly determined the rental rate for a 25-year extension set to begin in 2028. Although the fair-market value specified by two of the appraisers doesn't violate any contractual terms or other legal limits, it is dated to the appraisers' 2025 assessment rather than the 2028 renewal period. To clarify that temporal relationship and its effect (if any) on the rental rate, the Court remands the matter to the appraisers for this limited purpose.

## I. SUMMARY-JUDGMENT RECORD

James Thornberry[1] agreed to lease a parcel of land to Martin Barbour in October 1973. *See* Lease (DN 1-1). Since then, Barrett and Mollie McGaw, as representatives of the McGaw Family Trust, became co-lessors with Thornberry. Complaint (DN 1) at 2. Rogers Kentucky, LLC, meanwhile, succeeded Barbour as the lessee. *Id.* at 5. Today the parcel includes several buildings and units that Rogers leases to other businesses as part of a commercial strip mall. The lease covered 55 years—from 1973 to June 14, 2028. And it included an option to extend for an additional 25 years:

> At the end of 55 years, provided the lease is still in force at that time, Second Party shall have a renewal option for an additional 25 years with the annual rental for the premises during this period of time to be determined by 3 professional appraisers or realtors, one of whom shall be selected by the First Parties, one of whom shall be selected by the

[1] Although both James and his wife Grace Thornberry were originally lessors, only James has remained as an owner of the property and party to this lease.

> Second Party, and the third of whom shall be selected by the first two, whose determination of the fair value of said property shall be binding upon all of the parties hereto, their heirs, successors and assigns. In determining the rental value of the premises during this 25 year period of time, the appraisers will not consider the improvements that Second Party has placed on the property but will base the rent on the value of the unimproved property.

Lease at 2–3.

To trigger this extension, the lease required (seriously) advance notice: five-and-a-half years before the renewal period would begin. *Id.* at 3. Accordingly, Rogers informed the Lessors (Thornberry and the McGaws) back in September 2022 that it intended to renew the lease. Rogers Motion for Summary Judgment (DN 37) at 5. Rogers also designated its chosen appraiser, the Lessors selected theirs, and those two jointly picked a third. *Id.* at 5–6. But before the appraisers could get to work, the Lessors instructed their chosen appraiser to "halt" the appraisal process, reasoning that the appraisal should happen no earlier than the start of the renewal period in 2028. *Id.* at 6.

## II. This Litigation

Rogers filed this lawsuit to stop the Lessors from obstructing the appraisal process. The Lessors filed a counterclaim for breach and also sought a declaratory judgment that the lease was void. Answer & Counterclaim (DN 13). Later, without objection from Rogers, the Lessors dropped their breach claim. DNs 65, 66, 67.

After both sides filed dueling summary-judgment motions, the Court granted and denied each in part. *See* Hearing Transcript (DN 80). The Court (1) rejected the Lessors' argument that the renewal clause was void for vagueness, *see id.* at 7, (2) rejected the Lessors' argument that the appraisers must be unanimous, *see id.* at 9, and (3) explained that the "right time to set a price" for the renewal period is a question left to the appraisers' discretion, *id.* at 10. The Court then directed the parties to begin the appraisal process.

Counsel for the parties gave the appraisers the following instructions in line with the Lease and the Court's order:

> "1. The appraisal process should begin immediately."
>
> "2. The three appraisers shall make a binding determination of annual rental for the premises to be paid during the renewal period according to the lease via a collective process consistent with the customs and standards of the profession. Pursuant to Paragraph 7

of the Lease, in determining the rental value, 'the appraisers will not consider the improvements that [Rogers Kentucky, LLC, and prior tenants have] placed on the property but will base the rent on the value of the unimproved property.'"

"3. The renewal period of the lease will not begin until June 15, 2028, and the renewal period will last for a period of twenty-five years."

"4. In determining the annual fair rental value, unanimity is not required. Any decision should be made by a majority of the appraisers."

Appraiser Instructions (DN 95-1) (brackets in original).

After visiting the shopping center on April 1, 2025, two of the appraisers determined that the "Fair Annual Rental Rate" of the property, "as of April 1, 2025," was $48,000. Appraisal Award (DN 94-1) at 1. Their report presented their topline conclusion and explained the scope of their work, but omitted any "rationale for how the appraisers arrived at the opinions and conclusions set forth in th[e] report." Appraisal Award at 2. This approach was consistent with the minimum standards for a "restricted appraisal report"—a type of report prepared when the client is the intended user. Appraisal Standards Board & The Appraisal Foundation**,** *Uniform Standards of Professional Appraisal Practice*, Rule 2-2(b)(i)–(ii), at 25 (2024 ed.) ("USPAP"). The third appraiser, in a separate report, concluded that the fair annual rental value of the property was $90,000, though he did not expressly tie that value to any particular term or date. Dissenting Appraiser Report (DN 95-3) at 2.

Rogers then asked this Court to confirm the Appraisal Award. Motion to Confirm Appraisal Award (DN 94). But the Lessors still oppose that valuation for several reasons: it wasn't unanimous (an argument advanced only by Thornberry, *pro se*, and previously rejected by this Court); the appraisers violated industry standards by failing to include an escalator or cost-of-living adjustment; and the appraisers didn't key their decision to the June 15, 2028, start of the renewal period.[2] The appropriate next steps, according to the McGaws, are to deny confirmation and refer the case to a magistrate judge to oversee the appraisers. McGaw Response (DN 95) at 6–7.

[2] The McGaws also infer that the appraisers' delay (eight months) in issuing an award reflects confusion about their task. McGaw Response at 7. But delay alone signals little if anything about their contractual compliance. Nor does it shed any light on their reasoning. To the extent it's even relevant, the length of deliberation is at least as consistent with thoroughness and thoughtfulness as a lack thereof.

Thornberry, on his own, also moved for summary judgment on the no-longer-live breach claim, and asks the Court to terminate the lease and award him immediate possession of the premises. Thornberry Motion for Summary Judgment (DN 99) at 6. Rogers, in response, moved to strike Thornberry's motion. Motion to Strike (DN 100).

### III. Rogers' Motion to Confirm the Appraisal Award and the McGaws' Motion to Refer the Case to a Magistrate Judge

"Generally, a court will not interfere with an appraisal award but, to the contrary, will indulge in every reasonable presumption to sustain it." *Lakewood Manufacturing v. Home Insurance Co. of New York*, 422 F.2d 796, 798 (6th Cir. 1970). As a result, "appraisals are presumptively valid and should not be lightly set aside," unless "upon a showing of fraud, bad faith, a material mistake, or *a lack of understanding or completion of the contractually assigned task*." *Kenneth D. Parrish, DMD, Ph.D., P.S.C. v. Schroering*, 636 S.W.3d 133, 144–45 (Ky. Ct. App. 2021) (emphasis in original) (quoting *Calais Co. v. Ivy*, 303 P.3d 410, 416–17 (Alaska 2013)).

Nothing signifies such a misunderstanding here. The parties' lease expressly defines the appraisers' task: determining "the annual rental for the premises during [the 25-year renewal] period of time." Lease at 3. And "[i]n determining the rental value of the premises during this 25 year period of time, the appraisers will not consider the improvements … placed on the property but will base the rent on the value of the unimproved property." *Id.*

Consistent with these terms, the Appraisal Award assessed the property as if it were vacant and unimproved. And nothing about the appraisers' report indicates that they have strayed from industry standards or customs in making their assessment. The Award explains that the appraisers physically inspected the property and obtained further information from surveys, legal descriptions, and public records. Appraisal Award at 2. And in determining the rental value of the property, they adopted the Dictionary of Real Estate Appraisal's definition of "fair rental."[3] *Id.* They then "collected and confirmed data in the local market through research of public records" and "investigated several nearby counties, as well as

[3] Using the Appraisal Institute's *The Dictionary of Real Estate Appraisal* (7th ed. 2022) at 117, the Appraisal Award (at 3) defined "fair rental" as:

> [T]he most probable rent that a property should bring in a competitive and open market under all conditions requisite to a fair lease transaction, the lessee and lessor each acting prudently and knowledgeably, and assuming the rent is not affected by undue stimulus, including the rental adjustment and revaluation, permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs).

national market data, as appropriate." *Id.* at 3. The appraisers verified any "individual transactions" they considered by using "buyers, sellers, brokers, agents, bankers, appraisers, recording documents, multiple listing services, assessor's records, and/or other sources believed to be reliable." *Id.* These efforts provide little reason to doubt that the appraisers acted "in conformity with the requirements of the Code of Professional Ethics[,] the Standards of Professional Practice of the Appraisal Institute and the Appraisal Foundation, as well as the Competency provision of the Uniform Standards of Professional Appraisal Practice (USPAP)." *Id.*

The Lessors identify three reasons why, in their view, the Appraisal Award violated the Lease or Kentucky law. The first two lack merit, though the third requires the appraisers to answer one remaining question about their decision.

*First*, Thornberry (previously counseled, now *pro se*) repeats the Lessors' earlier argument that the appraisers' decision must be unanimous. Thornberry Response (DN 96) at 1. But the Court has already determined that "the logical inference here is that majority would rule." Hearing Transcript at 9. This decision was consistent with both the language of the contract and precedent regarding appraisal awards. *See, e.g.*, *Norfolk S. Railway v. Zayo Group*, 87 F.4th 585, 591–92 (4th Cir. 2023) (majority of three appraisers controls absent limitations specified in lease). Though the Lease does not specify whether the appraisers must unanimously agree to an award, neither does it specify unanimity. Thornberry offers no explanation why the Court's commonsensical interpretation was erroneous, and none has become apparent in the meantime. Thornberry Response at 1.

*Second*, the McGaws object to the Appraisal Award's failure to incorporate a rent-escalation or cost-of-living function into the renewal amount. McGaw Response at 5–6 ("Real estate lease customs require the imposition of a cost-of-living adjustment or rent escalator in a lease of this duration."). Again, however, the Lease includes no requirement for any such feature. Rather, it merely instructs the appraisers to "determin[e] the rental value of the premises during th[e] 25 year period of time" without considering "the improvements ... placed on the property." Lease at 3. Plainly, the long-term nature of the lease would seem to *allow* appraisers to include such a term, and nothing rejects such a concept in favor of a flat amount stretching over 25 years. Indeed, such a result would be consistent with the rent escalator included in the initial 55-year lease term. Lease at 1–2. Still, contrary to the McGaws' assertions, this is a matter left to the discretion of the appraisers, operating under their own professional standards—not a question for judges operating under legal constraints. The McGaws identify no supporting authority for their position.

*Third*, the Lessors offer the related critique that the appraisers in the majority have not specified whether their award accounts for the current fair market value or the value that should be assessed as of the renewal period's start on June 14, 2028. All the Award says on this potentially critical timing question is that the fair market value "as of April 1, 2025" is $48,000 per year: "the Fair Annual Rental Rate for the 12.993 acre unimproved site, as if vacant, as of April 1, 2025, *was* $48,000." Appraisal Award at 4 (emphasis added). This appears to be consistent with the requirement of the 2024 Uniform Standards of Professional Appraisal Practice to specify the effective date of a "restricted appraisal report." *Uniform Standards of Professional Appraisal Practice*, Rule 2-2(b)(ix), at 25.

Yet it leaves unsettled an important task the Lease assigns the appraisers: determining "the annual rental for the premises during" the renewal term; in fact, the report nowhere mentions the June 14, 2028, renewal date or the 25-year term of renewal. Lease at 3. The parties' instructions to the appraisers mentioned the 2028 start date and nothing about 2025—other than that the process should begin "immediately." Appraiser Instructions at 1. And though the Appraisal Award explains that the "function of the appraisal … is to determine the Fair Annual Rental Rate," the report tethers that rate only to April 1, 2025. Appraisal Report at 2. Notably, the report goes on to say that the appraisal "is for use *in the determination of* the annual rental for the renewal between the current owners and the current lessee." *Id.* (emphasis added). This formulation leaves ambiguous, at best, whether the appraisers contemplated some further step in that determination. Yet the fairest reading of the contract is that the appraisers themselves would determine that rental value—not leave it to any subsequent application beginning in 2028 and continuing through 2053.

By the terms of the lease, the appraisal is not "*for use in* the determination of rent for the renewal period," but is to *be* the determination of rent for the renewal period. So an appraisal award that does not expressly connect its fair-market value determination to "th[e] 25 year" renewal period beginning June 14, 2028, is at least incomplete or ambiguous in carrying out the renewal procedure.

The Court therefore denies Rogers' motion to confirm, DN 94, and remands the award so the appraisers may address this lingering question.[4] *See generally Evanston*

[4] The third appraiser, who did not join the majority in the appraisal award, similarly did not purport to determine a fair rental value for the duration of the 25-year renewal term. To the extent the award does not determine the rental rate for the full renewal term, the Court directs all three appraisers to renew their efforts consistent with this order and the lease terms. On remand, the appraisers may, as discussed above, determine whether or not to include a rent escalator in their ultimate award for the renewal term.

*Insurance v. Cogswell Properties*, 683 F.3d 684, 689 (6th Cir. 2012) (decision to vacate and remand an appraisal award for failing to abide by the terms of the binding appraisal clause).

Answering this question, however, doesn't require referral to a magistrate judge to "sequeste[r]" the appraisers "like a jury to complete the task of establishing the fair rental value during the renewal term of the Lease." McGaw Response (DN 95) at 1. The Court must only "determine … whether the third party experts understood and carried out the contractually assigned task," given that the "obvious point of contracting for an appraisal process is to keep a jury or court out of that decision." *Schroering*, 636 S.W.3d at 144 (emphasizing courts' "limited power to review appraisal awards") (quoting *Calais*, 303 P.3d at 416).

## IV. THORNBERRY'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO STRIKE

Thornberry also moves, *pro se*, for summary judgment against Rogers, DN 99, alleging that he is entitled to judgment as a matter of law on a breach-of-contract claim. But like his unanimity argument, Thornberry's motion for summary judgment is untimely and unfounded.

The motion fails for two procedural reasons. First, he filed the motion more than nineteen months after the Court's June 21, 2024, deadline for parties to file dispositive motions, DN 69, and has identified no good cause warranting an extension of the deadline, *see* FED. R. CIV. P. 16(b)(4). Second, his motion seeks relief for a claim that he already dismissed. In a joint motion to amend his counterclaim, DN 65, Thornberry expressly struck from his amended complaint the breach-of-contract claim that purports to form the basis for this summary-judgment motion. So Rogers is correct that Thornberry hasn't established any basis for judgment in his favor.[5]

## ORDER

The Court:

(1) denies Rogers' motion to confirm the Appraisal Award (DN 94) and remands the matter to the appraisers;
(2) denies the McGaws' motion to refer the case to a magistrate judge (DN 95);
(3) denies Thornberry's motion for summary judgment (DN 99); and

[5] Rogers has styled its response to Thornberry's motion for summary judgment as a "motion to strike." DN 100. A motion to strike, however, applies only to pleadings, FED. R. CIV. P. 12(f), and a motion for summary judgment is not a pleading, FED. R. CIV. P. 7(a). Regardless, the Court construes the motion to strike as a response to Thornberry's motion for summary judgment, which fails for the reasons noted above.

(4) denies as moot Rogers' motion to strike (DN 100).

Benjamin Beaton, District Judge
United States District Court

September 30, 2026